## Richmond

COLONIAL MOTOR FREIGHT LINE, INC., ET AL. v. KATHLEEN L. NANCE.

January 16, 1976.

Record Nos. 741177 and 741188.

Present, I'Anson, C.J., Carrico, Harrison, Cochran and Poff, JJ.

*Nathan H. Smith; Aubrey R. Bowles, Jr. (Aubrey R. Bowles, III; Sands, Anderson & Marks,* on briefs), for plaintiffs in error.

*James A. Eichner (Allen, Allen, Allen & Allen,* on brief), for defendant in error.

HARRISON, J., delivered the opinion of the court.

Kathleen L. Nance recovered a judgment against Colonial Motor Freight Line, Inc. and Glosson Motor Lines, Inc. for damages sustained by her in an automobile accident. A writ of error was granted the appellant companies limited to a consideration of whether their negligence, or that of either, was causally related to the accident.

The accident occurred on March 11, 1973, about 5:30 p. m. on U. S. Route 360 at a point approximately five miles west of Richmond. The highway consists of two eastbound and two westbound lanes divided by a median strip. There is also an additional eastbound lane which is used for making left turns. The road has a black asphalt

surface and is straight and level. The weather was cloudy at the time, but the road was dry. The vehicles involved, which were all proceeding east, were: (1) a 1971 Chevrolet Impala four-door sedan, which was being driven by Mrs. Nance, and which was pulling a 19 foot long 1973 Cheetah travel camper; (2) a tractor-trailer truck owned by Colonial Motor Freight Line, Inc., and driven by Sherman Lee Davis; and (3) a tractor-trailer truck owned by Glosson Motor Lines, Inc., and driven by Dossie Eugene Soles. Present, but not involved, were two other tractor-trailer trucks owned by Glosson, and a Datsun automobile operated by John L. Ogle, III.

Prior to the accident the vehicles were positioned as follows: The Nance vehicles were in the outside or driving lane of the highway. Behind her and in the same lane was the Colonial truck, followed by the other two Glosson trucks, operated by A. C. Legrand and Howard Wyatt, Jr. In the passing or inside lane was the Glosson truck operated by Soles, and behind Soles was Ogle. The Colonial truck pulled over into the passing lane, passed the Nance vehicles and proceeded ahead. After Colonial passed, Mrs. Nance lost control of her vehicles. They wrecked and overturned and, while rolling down the highway directly in front of the Glosson truck driven by Soles, were struck by this truck.

The accident was investigated by Chesterfield Officer T. R. Gleason who took numerous pictures and observed the various markings on the highway. He testified that "[t]he automobile and camper dropped off the right-hand side of the roadway . . .", at a point where there is an eight inch drop to the shoulder. He said that "there was a faint trail where the camper went off, and just after it went off it immediately came back on and went back across the roadway at more or less a 45-degree angle" before overturning. He estimated that it was 150 feet from the point where the camper came back on the highway to where it ultimately came to rest. He found the car and camper upside down, blocking the entire passing and left turn lanes. Gleason further testified that tire marks made by the Glosson truck (Soles) also extended 150 feet, and indicated that its driver had his brakes "tied down intensely". He said that the impact between the Glosson truck and the Nance vehicles occurred in the extreme left lanes; that the marks showed that the Glosson driver was pulling to the left; that the Nance car was struck by Glosson while it "was up on its side, in the process of turning over"; and that the imprint of the car's left front tire and rim was found in the radiator of the Glosson truck.

Colonial's driver Davis said that he was operating a tractor-trailer directly behind the Nance vehicles at a speed of 50 to 55 miles per hour. He said that a Glosson truck came up in the passing lane and that its driver, Soles, apparently observing that the Nance vehicles were moving slowly and that Davis would be boxed in, gave Davis a signal to pass. Davis said that Soles "flashed his lights for me" and that when Davis was about three or four car lengths from the camper he pulled into the passing lane and passed the Nances. Davis testified that when he went by Mrs. Nance the Glosson truck "was a good safe distance behind me", estimated by him to be two to three lengths of a "rig", which he said is 55 feet long.

Mrs. Nance, who was 56 years old, testified that she and her husband had pulled the camper to Burkeville to a funeral because they "wanted to get driving experience". The camper had been purchased two weeks prior to the accident and March 11th was only the second time she had ever driven the car with the camper attached. She said that her speed was 45 miles per hour; that she had been instructed to remember "never to slam on the brakes and never to jerk the wheel"; and that, since the camper was wider than a car, she was also told to watch "through the side view mirror to be sure that I was within the white line". Her complete explanation at trial of how the accident occurred is as follows:

> "Well, I was driving along, and the first trailer zipped past me. I would say he was going 60 to 65 miles an hour. He passed me like I was standing still, and I felt my trailer swerve, and I looked in my side view mirror and saw this other trailer coming up on me, and my husband reached over and very gently squeezed my wrists, and that's all I remember."

On the night of the accident Mrs. Nance was interviewed in the hospital at a time when she was upset and had been sedated. Officer Gleason testified that she told him:

> "I saw that truck up beside me and I must have jerked the wheel, I remember my husband putting his hand beside me to steady me—it was the second time I had pulled the camper trailer. I pulled last Sunday with no trouble."

In a discovery deposition Mrs. Nance's account of the accident was:

> "Well, that's what happened, the tractor-trailer passed me at a high rate of speed, my camper swerved, another trailer came up

on me and my husband reached over and grabbed my arm, and that's all I know."

The plaintiff never claimed that the operation of her vehicles was affected by wind pressure from the passing Colonial truck, or that the truck veered over into her lane. From Mrs. Nance we have only the bare statement that the Colonial truck passed and that she felt her camper swerve, and her further statement that the Colonial truck had passed and gotten by her when she first noticed the swaying. She was asked: "And that was the point, as I understand it, that the next recollection you have is your husband pressing his hand on your hand, is that correct?" She replied: "No, as the trailer began to swerve, immediately as the first tractor-trailer passed, the camper began to swerve, and I looked in my side view mirror and saw this other tractor-trailer right upon me, and I felt the force, and that's when my husband reached over."

Mrs. Nance remembers nothing of what occurred after her husband grabbed, squeezed or touched her arm.

Regarding the location of the Glosson truck when Mrs. Nance felt the swerve, it was her "guess" that she saw the nose of the truck in her side view mirror, "right by my camper". The plaintiff made no complaint of the speed of the Glosson truck.

Glosson's driver, Soles, testified that he was driving in the passing lane of Route 360 with the intention of passing the Colonial truck when he noticed the car and camper in front of Colonial. Soles said that had he then passed Colonial he would have boxed its driver in behind a slow moving vehicle, so he gave the Colonial driver "the light", and the latter came out into the left or passing lane and passed the camper. Soles said that as the Colonial truck passed, he observed that the Nance vehicles came over close to the truck, but that there was no contact between the vehicles. Thereafter he noticed the camper rocking or wiggling, but not out of control; then suddenly it did go out of control, with the car and camper turning over on their sides in front of him in his lane.

Soles said he had started slowing down, "backing away from it, backing off", and when the car and camper veered over in his lane and wrecked in front of him, he headed for the left turn lane with his brakes "locked down". He estimated his speed at 50 to 55 mph when he signaled the Colonial truck to pass the Nance vehicles, and said from then on he was slowing down. He further estimated the

distance between the front of his truck and the rear of the Colonial truck to have been "3 to 4 trailer lengths".

In the vicinity of the accident there were other persons who later testified. Robert Moates, who operates Bob's Sports Shop on Route 360 in a building located on the north side of the highway, was inside his building at the time, talking to two customers. His attention was called to the highway either by the noise or the sight of the accident. He observed that after the camper was passed by a tractor-trailer the camper began to get out of control. He estimated the speed of the vehicle that passed Mrs. Nance to have been "[a]bout the speed, I would say, of the traffic of the day, 60 miles an hour".

He also said that the Glosson truck ran into the side of the Nance car as it and the camper were turning over in front of the truck, and that the Glosson driver did "everything in the world that he could to slow down" and "avoid hitting him". He saw the Glosson truck put on brakes after the camper started weaving from side to side, and agreed that "if a camper and a car hadn't turned over in front of him [Soles], he wouldn't have hit them".

Forrest Moore, who was engaged in conversation with Moates at the time, observed the Nance vehicles "going out of control on the highway, and looked like it was jumping, bouncing in the road and in a slide". He said that the camper was swinging to its left, "The momentum was swinging to its left . . ." He estimated the speed of the Glosson truck to have been "just about 65, I guess", and that of the Colonial truck at between "65, maybe 70".

John L. Ogle, III, who was then the news director for radio station WRVQ, said that he witnessed the accident. He saw the Colonial truck pass the Nance vehicles and estimated that it was 100 yards ahead of the car and camper when they went out of control. Ogle said that when he got in the passing lane the Glosson truck which struck the Nance vehicles was already there. He estimated the speed of the vehicles at "somewhere between 50 and 60 miles an hour". His testimony was that the camper began "to gyrate quite wildly" after the Colonial truck had passed, and before the car and camper were hit by Glosson. He said Soles pulled "all the way to the left onto the median strip".

Legrand and Wyatt, driving the other Glosson trucks, estimated the speed of the trucks involved to have been between 50-55 mph. Legrand said the distance between the Glosson (Soles) and Colonial trucks was between 250-300 feet. He testified that after the Colonial truck passed the Nance vehicles and Soles had gotten "almost to the

camper, it began to sway, and then the brake lights come on, and it went off the road to the right and lift up and laid on the side and just slid right in front of him".

It was argued that the Colonial truck passed Mrs. Nance at an unlawful and excessive speed and that the excessive speed created air motion or pressure, which in turn proximately caused, or efficiently contributed to cause, the plaintiff to lose control of her vehicles. However, the plaintiff does not make for herself such a claim. She does not say that she lost control of her automobile because Colonial "zipped" by her, or as a result of any action by the Colonial truck. Her testimony was that after being passed by the Colonial truck and after the rear of the Colonial truck had gotten in front of her car, she felt the camper swerve.

While there is evidence that the driver of the Colonial truck may have been exceeding the 55 mph permissible speed limit, and that he failed to sound his horn before passing the Nance vehicles, there is no proof of any causal connection between these statutory violations and the plaintiff's loss of control. When the Colonial truck passed Mrs. Nance, it was entirely within its proper lane and did not encroach on her vehicles. It is likely that the passing of the truck did create some turbulence, and that the wind therefrom may have been noticable and may have affected Mrs. Nance to some degree. But she did not say so. And there is no other evidence to support a finding that the wind from the passing truck disturbed her or was a proximate cause of the accident. We cannot assume that it was in the absence of such evidence.[1]

There can be little controversy surrounding the operation of the Glosson vehicle by Soles. He intended to pass the Colonial truck and the Nance vehicles, but anticipating the predicament in which this would place the Colonial driver, he permitted Davis to pull into the passing lane and to pass the Nance vehicles. To permit this maneuver by the Colonial truck, it was necessary for Soles to reduce the speed of his truck. It was after the Colonial truck has passed that

---

[1] Plaintiff's expert witness, Ray M. Linville, testified that when a large vehicle passes a smaller one the displacement of air incident to the passing has a tendency to push the larger vehicle away from the smaller one at the time of passing. After the passing is completed, the action is reversed for the air flowing around the passing vehicle has a tendency to pull the vehicle being passed into the space which the passing vehicle recently occupied. He said that the size and relative speed of the vehicles involved were important, for the bigger the object the more air it displaces, and that the air flow is increased with the increase in speed. Linville also stated that a breeze from natural causes does the same thing as a breeze created by a moving object.

Mrs. Nance lost control of her vehicles. They turned over in front of Soles and completely blocked both east lanes of the highway. The witnesses testified that Soles locked his brakes and swerved to the left in an effort to avoid striking the overturned and rolling Nance vehicles.

We find no evidence that Soles was not exercising proper control over his truck or was not maintaining a proper lookout. Appellee argues that Soles was "following too closely" in violation of Code § 46.1-213.[2] But Soles was not following the Nance vehicles. Witnesses testified, and the markings on the highway show, that Soles was in the passing lane following the Colonial truck, preparatory to passing Mrs. Nance. We have heretofore concluded that the evidence fails to show that Colonial's actions proximately caused the overturning of the Nance vehicles. Therefore, the fact that the Glosson truck may have been following less than 200 feet behind Colonial cannot be deemed a proximate cause of the accident. Soles would have been confronted with the same situation had Colonial been 200 or more feet ahead of him. It was not the distance between Colonial and Soles that created the problem. It was the sudden and precipitate loss of control by Mrs. Nance.

Glosson's driver had little time and a short distance, less than 150 feet, in which to react, apply his brakes, pull left and try to avoid the accident, which was occurring in front of him. His proximity to the Nance vehicles when they went out of control is established by the fact that his truck struck the Nance automobile while the latter was in the act of rolling down the highway. Further, Mrs. Nance says the nose of the Glosson truck was beside the camper before she lost control. Under these circumstances we cannot say that Soles had a last clear chance, or in fact any chance, to have avoided striking the car and thereby minimizing the damages sustained by the Nances. Soles was confronted with a situation which he could not have reasonably anticipated and which he in no way contributed to cause.

We are not insensitive to the position in which Mrs. Nance found herself. She had little experience in operating an automobile while

---

[2] "46.1-213. Following too closely.—(a) The driver of a motor vehicle shall not follow another motor vehicle, trailer or semitrailer more closely than is reasonable and prudent, having due regard to the speed of both vehicles and the traffic upon, and conditions of, the highway at the time.

"(b) The driver of any motortruck or bus shall not follow another motortruck or bus within two hundred feet when upon any highway outside of cities or towns. (Code 1950, § 46-229; 1958, c.541.)"

pulling a 3500-pound, 19-foot camper, which was one foot wider than her car. The choice of heavily traveled Route 360 on which to gain that experience was an unfortunate one. At the time of the accident she had just been passed by one 55-foot tractor-trailer, another was approaching to pass her, and she was being followed by two more of the same type. However, the trucks were of lawful size and were entitled to travel the highway and to pass other vehicles so long as they did so in a proper manner and at the proper speed. Mrs. Nance was driving at 45 mph and at this speed it can be safely said that she was being passed by virtually all traffic moving east on the highway. The presence of four trucks, all running at or around the speed limit and passing slower moving traffic; the noise and turbulence that attends even a normal passing by large trucks; the inexperience of Mrs. Nance in pulling a camper; the drop in the highway; or the intervention of the husband, may have contributed to her loss of control.

We could evolve numerous theories as to how this accident occurred, but we are not permitted to indulge in speculation or conjecture, and neither is a jury. Negligence cannot be presumed from the mere happening of an accident. To support a recovery there must not only be negligence but there must be a causal connection between the negligence and the accident.

Mrs. Nance received a jury verdict and it was approved by the trial judge. We have therefore viewed the evidence in the light most favorable to her. However, the difficulty is that the plaintiff does not know what happened or why it happened. Her husband was killed so we do not know what he did or intended to do when he reached over to plaintiff just prior to the accident. Mrs. Nance remembers nothing else after he took this action. And there was no other witness whose testimony provided the evidence necessary to show causal connection. Under these circumstances we have no alternative to setting aside the verdict and entering final judgment for the defendants.

*Reversed and final judgment.*

POFF, J., dissenting.

I dissent.

Ordinarily, causal relationship between negligence and injury is a factual question. Resolution of factual questions is a jury's *raison d'etre*. Only when the evidence is such that reasonable men could

not disagree does causal relationship become a question of law. Trial courts cannot comment upon the weight of the evidence or the credibility of witnesses; they cannot direct verdicts; and they cannot set a verdict aside unless it is without evidence to support it or is plainly wrong. Reviewing a jury verdict, appellate tribunals view the evidence and all inferences fairly deducible therefrom in the light most favorable to the prevailing party. And when a jury verdict is ratified by the judgment of a trial court, it has always been accorded special deference in this Court.

Here, the majority hold that the factual determination made by the jury and confirmed by the trial court is without evidence to support it. I do not agree. The posted speed limit was 55 m.p.h. Mrs. Nance, Robert Moates, and Forrest Moore testified that the Colonial truck driven by Davis was exceeding that speed as it passed Mrs. Nance. That is evidence of negligence. Negligence, of course, is not culpable unless it is causally connected with the injury. Concerning causal connection, it is true, as the majority point out, that neither Mrs. Nance nor her expert witness testified that the wind turbulence created by Colonial caused the Nance vehicles to go out of control. But such testimony would have been opinional and, going to the ultimate fact in issue, inadmissible.

Evidence of causal connection is seldom direct. Typically, causal connection determinations depend upon inferences deducible from direct evidence. The evidence was that the Colonial truck was 55 feet long and was travelling at a rate of speed as high as 65 m.p.h. and that the Nance trailer was 19 feet long and was travelling at a speed of 45 m.p.h. The expert testified that air displacement caused by a large vehicle passing a smaller vehicle increases in volume and force as the speed differential between the two vehicles increases; that air displacement tends to force the passing vehicle away from the other at the time it passes; and that after the passing is completed, the turbulence tends to pull the passed vehicle into the space recently occupied by the passing vehicle. Mrs. Nance testified that "immediately as the first tractor-trailer passed, the camper began to swerve". Such evidence fully supports the inference that the large, fast-moving Colonial truck passing the smaller, slower-moving Nance trailer created a substantial air displacement force and that this force was a proximate cause of the accident.

There was direct evidence to support a finding that Soles, the driver of Glosson's truck, was negligent. While it is true, as the majority say, that Mrs. Nance made no complaint of the speed of the Glosson

truck, Forrest Moore, a disinterested eyewitness, testified that "my estimate was 65". This was a statutory violation. In addition, Davis testified that the Glosson truck was two to three trailer-lengths behind his truck, a distance of not more than 165 feet. Moore said that the distance was "[m]aybe 120 feet". Code § 46.1-213 mandates a minimum distance of 200 feet. These two statutory violations constituted negligence as a matter of law. But the majority say that such negligence "cannot be deemed a proximate cause of the accident" because "Soles would have been confronted with the same situation had Colonial been 200 or more feet ahead of him." However, on cross-examination Soles testified that "[t]wenty more foot, I would never have touched it [the Nance vehicles]." From such evidence, the jury could fairly infer that the two statutory violations proximately contributed to the accident.

The evidence and the inferences fairly deducible therefrom support the jury's factual findings, and I would affirm the judgment confirming the verdict.